## THE PEOPLE v. EDWARD F. REILLY

*Pool-selling not punishable as a lottery.*

Pool-selling is not punishable as the offence of maintaining "a lottery for disposing of money," within the meaning of a municipal ordinance against keeping any "lottery, policy, bucket-shop, board of trade or any other scheme or place for drawing or disposing of money, wheat or other property within the city."

Certiorari to the Recorder's Court of Detroit. (Swift, J.) April 12.—April 18.

COMPLAINT for pool-selling. Respondent was convicted. Conviction quashed.

City Attorney *John B. Corliss* and City Counselor *Henry M. Duffield* for the People. Where a pecuniary consideration is paid and it is determined by lot or chance, according to some scheme held out to the public, what the party who pays his money is to have for it, or whether he is to have anything, it is a lottery: *State v. Clarke* 33 N. H. 329; *Hull v. Ruggles* 56 N. Y. 424; in *State v. Lovell* 39 N. J. L. 458, 463, auction pools, French pools, and combination pools

upon horse races were held to be lotteries within the criminal act, and a place of public resort kept for the sale of pools on horse races, was held to be a disorderly house, even where the horses upon which the pools were sold took place outside of the state.

*F. A. Baker* for respondent.

CAMPBELL, J. Respondent was convicted under an ordinance of the city of Detroit, section 3 of which undertook to punish the maintaining of any "lottery, policy, pool, bucket-shop, board of trade, or any like scheme or place for drawing or disposing of money, wheat, or other property within the city." The complaint was in general terms, and without details or description of the offense charged, except that it was keeping and maintaining "a pool for disposing of money by means of wagers on games of base-ball, horse-races, and other like games and sports," and maintaining "a lottery for disposing of money."

The power given by charter over various offenses partaking of the mischief of gambling was fully exercised by other sections of the ordinance, and could not, by any reasonable construction, include pools or lotteries. The only remaining power within the same class of mischiefs is that to "prohibit, prevent and suppress all lotteries for the drawing or disposing of money or any other property whatsoever, and punish all persons maintaining, directing or managing the same, or aiding in the maintenance, direction or management thereof." Sec. 43.

The offense which the Recorder finds respondent to have committed consisted in what seems to be commonly known as pool-selling, and the facts indicate that the pools were made up of amounts bid for the privilege of selecting horses out of those running in races, and of bets of as many as saw fit to do so, by purchasing checks deposited on base-ball matches, where those who bet on the winning combination received the pool. Respondent had nothing to do with the races or matches.

That this is a species of gambling is clear enough, but whether it amounts to keeping a lottery is a very different question. The term used in the charter is the same used in the criminal law of the State, and was undoubtedly used, as the other charter language was used, in a similar sense. It is a safe and necessary rule to construe criminal statutes so as to include what is fairly and reasonably within the legitimate scope of the language, but not to include what is not within the language, merely because it partakes of similar mischievous qualities. The legislative authority very frequently makes large differences between the punishment of wrongs involving many resemblances in quality, because the extent of the mischief is greater, and the depravity more serious in some than in others. And while all kinds of gambling belong morally to one family, the discrimination between the several kinds is so great that courts cannot justly confound them by construction. Lotteries are made subject to the heaviest penalties imposed on any misdemeanor, and a second offense is made a felony. Comp. L., §§ 7735–7737. All other kinds of gambling covered by the statutes, even in the enlarged scope of the most recent legislation, have a maximum punishment bearing no comparison with the penalties for lotteries. Pub. Acts 1877, p. 167.

Without discussing the limits of legislative power which may be conferred upon cities in such matters, it is clear that they have no inherent power over them, and cannot exceed the authority granted.

The statutes concerning lotteries, which go back into the territorial period, have from the beginning provided the same penalty of two thousand dollars as the fine which might be imposed. Act of June 30, 1828, (3 Terr. L. 687). This statute, which was "An act to suppress private lotteries," goes more into detail than the subsequent statutes, and shows very clearly that the evil aimed at was that class of schemes whereby large numbers of persons are enticed into purchasing tickets for the distribution of prizes in money or property upon some sort of drawing or allotment by chance. It is also to be noticed that one primary object

was to punish such acts as the assumption of privileges, which it was then customary to grant to the aid of various public enterprises. Lotteries were frequently allowed to raise money for public improvements, such as schools, bridges, etc. Thus in 1805 four lotteries were authorized for the benefit of the city of Detroit, shortly after the destruction of the town by fire. 1 Terr. L., 67. Four lotteries were allowed for the benefit of the University in 1817. 2 Terr. L., 105. Lotteries were also authorized in 1829 to secure free bridges and improved highway communication between Detroit and Monroe. 2 Terr. L., 731.

By the Constitution of 1835 (art. 12, § 6) it was provided that "no lottery shall be authorized by this State, nor shall the sale of lottery tickets be allowed." There can be no doubt what was meant by this language, and it clearly referred to the class of enterprises which had formerly been lawful if authorized by law, and criminal if unauthorized. The statute of 1828 covered all such cases adequately, and remained unchanged until the Revised Statutes of 1838, which introduced the sections now in force, and which has only been once amended, in 1867. Rev. St. 650. This section covered originally two classes of offenses: *First*, lotteries as usually understood, with tickets written or printed, or some equivalent device securing shares in a distribution of prizes; and *second*, distributions by raffling. The penalty was unchanged. The reviser, both in his head-notes and in his index, retained the old idea of "illegal" lotteries, as simply prohibited offenses as against public policy. In the Revision of 1846 (p. 685) the section of 1838 was retained without variation. And in the subsequent compilations it is noticeable that this offense is classed in the same category with illegal banking and fraudulent stock issues, both of which are usually committed in such a way as to involve large amounts and numerous persons defrauded.

In 1867 (1 Sess. L. 1867, p. 122) an amendment was made inserting after the word "lottery," when it occurred, the words "or gift enterprises," but in no other way varying the substance of the statute, which still remains as then

amended. This change was no doubt introduced from a doubt whether the gift enterprises which were then becoming numerous, belonged strictly to the class of lotteries, because in some respects conducted in different ways, although reaching similar results.

No one can compare the legislation of the State without seeing that the Legislature has found it desirable to deal with lotteries differently as well as more severely than with other gambling transactions. The reason is not difficult to find. Lotteries generally involve large sums of money, or large prizes of some kind, and circulate their tickets in large numbers and in all parts of the country. All classes and persons of all ages are tempted to invest in the chances of sudden riches, and it is a matter of history that the passion for such investment has led to serious and wide-spread mischief. No other form of gambling operates as extensively in its dealings or demoralizes so many people. It is this extensive reach and not merely its speculative purposes which makes lottery-gambling so dangerous. The profits are so great that small penalties might not be efficacious enough to suppress the business, and the changes of our own legislation indicate this by the successive addition of imprisonment in the county jail, and even in the State Prison, to the large fine first imposed in 1828.

It is not safe to extend these serious consequences by construction to cases which are not fairly within the language of the Constitution and statutes, especially as the Legislature has made provision for much lighter punishment in those cases of gambling which are more confined in their action, and therefore less likely to do mischief on a large scale. We think that it would be straining the law to include such acts as those of the respondent within the category of lotteries, and therefore we must treat the case as one which has not been placed by the Legislature under the classification of offenses which should be left to be dealt with by the municipal by-laws and ordinances, as well as by State laws. As already suggested, we are not now required

to discuss the propriety of such a delegation of authority, if made.

The conviction must be quashed. We do not think it calls for costs of reversal.

The other Justices concurred.